In re Luis Abella Blanco, Respondent.

No. 68.   Argued March 6, 1947.—Decided April 22, 1947.

*Cayetano Coll y Cuchí* for respondent.   *Joaquín Correa Suárez, Assistant Prosecuting Attorney,* for The People.

Mr. Justice Snyder delivered the opinion of the Court.

Luis Abella Blanco, attorney-at-law, was Registrar of Property of Caguas for a number of years until he was

removed from that post by the Governor. See *Abella v. Piñero, Governor,* 66 P.R.R. 690. The Attorney General filed this complaint for his disbarment. We heard testimony submitted by both sides and took under advisement certain legal questions submitted by Abella.

*First Charge. Abella solicited $200 and obtained $100 from Aida Grillo to inscribe a cancellation of a mortgage.*

Aida Grillo testified that Abella sent for her father, Antonio Grillo, to discuss with him at the house of Abigail Aldrich a deed of cancellation of mortgage which her father had presented in the registry for recordation. Since her father, who subsequently died, was ill and could not go, she went in his place. Abella told her the document was defective, but that he could arrange to register it for $200. She refused, saying that if the document was defective, it should not be registered and that she would consult her father's lawyer.

Thereafter, registration of the document was refused and Abella sent for her again. He told her there was something irregular about the document and that the registrars had the power to send such cases to justice for investigation. He read to her from a book entitled "The Mortgage Law" to that effect. She replied that, according to her father's lawyer, the document was not fraudulent and that if he wanted to send the case to justice he ought to do it. He insisted there was no necessity to do that if she would give him $200. She replied she could not do that.

The ruling of the registrar was appealed to this Court and was affirmed. Thereafter, Abella telephoned her and told her he knew the document was going to be sent to the registry for inscription again and that he wanted to talk to her about it. Abella met her in the office of her lawyer and said he had discovered that she was thinking of sending the document to the registry again. She said that was true, that it would be presented with the will of Mrs. Martina García to prove that her father had not been the executor of the

latter's estate. Abella told her that she was stubborn and ought to give him the money in order to close the case because he was thinking of transferring to the Bayamón Registry and he was the only person who could record the document as he was the one who had had the documents in his hands. She told Abella that her attorney had told her the document was recordable and she could not give him that amount. Then he said that she should give him $100 to inscribe it. She answered that despite the fact that she knew the document was recordable, she was going to give him that amount to inscribe it.

She took the document and will to the registry, and a few days later Abella telephoned her that the document was inscribed and to come and get it and to bring the money. Accordingly, she went to the registry, got the document, and gave Abella the money in cash. When she gave him the money, he inscribed and presented her with a copy of his book, "The Republic of Puerto Rico".

On cross-examination she testified that she signed a receipt book presented to her by Pastor Batista, Chief Clerk of the Registry, in the office next to the registrar's office after Abella had given her the document in his office, where no one else had been present when she gave him the money. She gave him the money to end the matter. Abella had told her that the document could be recorded but that he was the only one who could do it.

Abigaíl Aldrich testified that she was employed in the Registry at Caguas, that Abella ate lunch at her house, that on two occasions Aida Grillo came to see him at her house, that they talked about a document, but she did not hear the conversation, and that Abella read to Miss Grillo from a book.

Luis Morales Contreras, an attorney, testified that, as Aida Grillo had testified, she was a client of his in 1944, that she met Abella in his office, and he voluntarily left them alone in his office to conduct their conversation.

We turn now to the testimony offered by Abella to refute the first charge. We note first that we rejected the reason given by the registrar—the possibility of fraud—for refusing to record the deed of cancellation. *Grillo* v. *Registrar,* 62 P.R.R. 652. We nevertheless affirmed the registrar for a reason given not in his ruling, but in his brief; namely, that since Antonio Grillo was named executor in the will of Martina García Reyes, he could not, in view of § 1348 of the Civil Code, acquire by purchase the mortgage credit left by the decedent in her will to her sister.

Abella conceded in his testimony that the statement in his brief that Antonio Grillo was named executor in the will of Martina García was erroneous. His explanation as to how he came to misinform us in this respect is dubious. He testified that he was typing his brief in that case while Pastor Batista was reading to him from the registry books, and that Batista said, "Look, Grillo appears here as executor and he therefore cannot acquire this mortgage credit." He thereupon included that contention in his brief. No such entry was in the registry. The fourth inscription of the property stated only that in her will Martina García had named Grillo as commissioner in partition.

It is difficult to believe that the registrar would accept the mere *ipse dixit* of an employee of a basic fact which the registrar never raised in his original ruling. It is significant that Batista, a witness on behalf of Abella, testified on cross-examination that he did not remember if he told this to Abella when he was reading the inscriptions to him. Moreover, on motion for reconsideration, which we denied because it was presented too late, counsel for the petitioner pointed out that Grillo had never been the executor. Abella was served with this motion and filed an opposition thereto, on the ground that an executor and a comissioner in partition were the same thing for purposes of § 1348.

He testified that the question did not come up again for ten months, when counsel for Miss Grillo spoke to him about

it and he suggested that she present the document again. When it was presented to him again, he recognized his error and corrected it by registering the property without any defects. When Miss Grillo brought the document to be registered she told him she wanted to make a gift with which to pay the employees who would work on it and the rest would be for him. He told her that no gifts were permitted there, and that he was complying with his duty because the document could be registered now that she had brought the will showing that Grillo was not the executor.

She asked him for a copy of his book "The Republic of Puerto Rico", and he promised to give it to her later, which he did when she came to Abigaíl's house again a few days later to talk to him about the case. He did not deliver the recorded document to her. This was done customarily by a subordinate. Because of this transaction, Miss Grillo had become an enemy of his and attributed her father's death to grief over this transaction.

Batista testified on behalf of Abella that he received the document from Miss Grillo for registration, that he delivered it to her after it was recorded, and that the registrar was not in the registry on the latter date. On cross-examination he could not explain why the Grillo document was promptly registered out of order despite the fact that a number of documents were pending registration ahead of it.

We need not determine whether Abella really believed that Grillo was the executor when he so stated in his brief here. However that may be, the testimony of Miss Grillo and all the circumstances satisfy us that her story is true and that Abella solicited $200 from her to register the document on the first occasion, and that he likewise solicited and obtained from her $100 to register the document after we affirmed his refusal to register it because he misstated the facts which appeared in the registry. We therefore find that the first charge has been sustained by the testimony.

*Second Charge. Abella solicited from E. Martínez Rivera $500 to inscribe without defects a deed of transfer of a mortgage credit.*

Martínez, an attorney with offices in San Juan, testified that he took a document to Caguas to be registered and left it with Abella. Several days later Abella telephoned him to come to see him at his home in Santurce. Martínez went there, and Abella told him that the document involved considerable study and that if Martínez was in a hurry, it would require work after hours and during week-ends for him and his employees to whom he would have to give extra compensation.

Martínez agreed to take up this matter of compensation for registry employees for work after hours with his client. The client authorized Martínez to spend $50 in this manner. When Martínez told this to Abella, the latter rejected the proposition. He said he had studied the document and had concluded that it could not be inscribed. He took a draft of a ruling rejecting the inscription out of his pocket and read it to Martínez. Martínez told him he was mistaken and should re-examine the question. He refused, whereupon Martínez told him to enter his ruling and he would seek review here. He told Martínez that he ought not to take this risk on such an important document; that he had had cases of this nature; that it was easy to arrange; and that if he brought him $500, the document could be registered without any defects. Martínez replied that it was the duty of the registrar to refuse recordation if the document was defective, and left.

Thereafter, Abella telephoned him that he had not yet denied the inscription because he wanted to give Martínez another opportunity. Martínez again refused to entertain this suggestion. Registration was denied, and this Court reversed the ruling of the Registrar and ordered the document to be registered. *Valiente* v. *Registrar,* 63 P.R.R. 143.

Luis Blanco Lugo, an attorney associated with Martínez in the practice of law, went to the Registry in Caguas on

another matter. He introduced himself and spoke to the registrar in an effort to convince him he had erred in another case. In the course of the conversation the *Valiente* case, which was then pending decision here and on which Blanco had worked, came up. Blanco explained to Abella why he thought he was also mistaken in that case. Then Abella told him that case was due to the stubborness of Martínez for not giving him $500.

The testimony of Abella, in reply to the second charge, was that he sent Martínez a copy of the ruling he was going to put on the document. Two or three days later, Martínez came to see him at his home in Santurce. Martínez told him he was mistaken and that Martínez could win in this Court. Abella said that the Supreme Court would decide the case. Martínez stated he wanted to save time and avoid judicial controversies, and if Abella would inscribe the document without defects, he would talk to his client to see if he could obtain $500 for Abella. He became offended and thought of punishing Martínez. He suggested they wait. Martínez replied he would return in two or three days.

The next day Abella immediately sent the document to Martínez denying the inscription. Two days later, Martínez came to see him again. He offered him an envelope containing $250, telling him he would give him the rest after the document was registered and would give him $50 out of his own pocket to dispose of the matter as soon as possible. Abella told him he was wasting his time and to keep his money because he had already denied inscription of the document.

Abella further testified that he had a conversation with Blanco in which the latter tried to convince him of his alleged error in the *Valiente* case. He did not speak to Blanco concerning $500 which Martínez should have given him.

The wife of Abella testified that she heard Martínez offer her husband $500 if he would resolve the situation involving registration of a document.

After examining all the circumstances, we conclude that Martínez and Blanco rather than Abella told the truth about the second charge. We therefore find that this charge has also been established by the testimony.

*Third Charge. Abella solicited and received $45 from Santiago Soto to inscribe a certain document without presenting a receipt for inheritance taxes which were allegedly due in connection with the transaction.*

Soto testified that Genoveva Rivera Rodríguez donated by a deed the remainder interest in certain real estate to his minor son, Carlos Soto Rodríguez, reserving the usufruct to herself. When she died, Soto presented her death certificate in the Registry in order to obtain a marginal annotation consolidating the full title in Carlos. Batista advised him that this could not be done without the payment of inheritance taxes. See §§ 1, 12, Act No. 99, Laws of Puerto Rico, 1925.

He told his attorney, Andrés Mena Latorre, about the matter. Mena said he would talk to Abella. Two days later, Mena telephoned him to come to his office. Abella was there, and they agreed that Abella would get $45 to inscribe the document. He went home and got the money, returned and gave it to Abella.

Mena testified to the same effect as Soto concerning this payment of $45 to Abella.

Abella testified in his own defense on the third charge that Mena had been his enemy since the Grillo affair because he had lost Grillo as a client as a result of the denial by him of the recordation of the document. Batista told him he had told Soto he had to pay inheritance taxes to obtain recordation of the document. Abella replied to Batista that this was not a fact and that the document could be inscribed without such a payment.

Mena telephoned him one day to come to his office. While he was there Mena phoned Soto to bring the money, telling him it was $50. Soto apparently objected, because he then

said that $45 would be all right. Abella was about to leave, but Mena insisted he stay. Soto came and put the money on Mena's desk and Abella left. Thereafter, when these charges were brought, on the day Abella was turning the registry over to the *Fiscal* because he had been suspended, Soto came there and told Abella that he was sorry because he had delivered the money to Mena in payment of the latter's fees.

Once more we find the testimony of the witnesses of the Attorney General more credible than that of Abella. We therefore hold that the third charge has been proved.

There remain for consideration several questions of law raised by Abella. Section 9 of the Act of March 11, 1909, provides that an attorney may be suspended or disbarred if he "[a] is guilty of any deceit, malpractice, felony or misdemeanor, in connection with the practice of his profession or . . . [b] is guilty of any crime involving moral turpitude . . .". Abella argues that (*b*) may be established only by showing a conviction in a court of competent jurisdiction. And as to (*a*), he contends that performance of the functions of the office of Registrar does not constitute the practice of law, *Pereyó* v. *López et al.*, 22 P.R.R. 725, § 9 of the Act of March 10, 1904; and therefore that his misconduct as a registrar cannot be punished pursuant to (*a*) of the 1909 Act because such misconduct to come under (*a*) must occur in connection with the practice of law.

■■ We cannot agree with these contentions. In the first place, we have inherent power to discipline the members of the bar of this Court. The Act of 1909 is only advisory, not binding on us. See *In re Tormes,* 30 P.R.R. 248; *In re Bosch,* 65 P.R.R. 232, 234; *Ex parte Jiménez,* 55 P.R.R. 51; *Guerrero* v. *Court of Tax Appeals,* 60 P.R.R. 236. Under our inherent power, it is our duty to disbar Abella if he has demonstrated by his conduct, not necessarily in the practice of law, that he is unfit to be an officer of this Court. *In re Tormes, supra; In re Chernoff,* 26 A.(2d) 335 (Pa. 1942);

*In re Welansky,* 65 N.E. (2d) 202, 204–5 (Mass. 1946); *In re Alschuler,* 58 N.E. (2d) 563, 567–8 (Ill. 1944); *Brant* v. *State,* 34 S.E. (2d) 735 (Ga. 1945); *Ex parte Montgomery,* 12 So. (2d) 314 (Ala. 1943).

■ Moreover, even if this were not the rule, only a lawyer may be appointed to the post of registrar. Section 1 of the Act of March 10, 1904, as amended by § 1 of the Act of March 16, 1909. And in the performance of his duties a registrar passes on legal problems and acts in a quasi-judicial capacity. *The R.F.C. Mortgage Co.* v. *Registrar,* 60 P.R.R. 230, 233. His misconduct in the performance of those duties is therefore clearly pertinent in determining if he is fit to remain a member of our bar. To hold otherwise would be to say in effect that a judge may not be disbarred for accepting bribes. See *Ex parte Grace,* 13 So. (2d) 178 (Ala. 1943).

■■ Abella argues that Miss Grillo and Soto were accomplices and that their testimony therefore required corroboration. In the first place, the record shows such corroboration. In addition, the giver and receiver of a bribe are not accomplices under the rule requiring corroboration of the testimony of an accomplice. *Forastieri* v. *Calzada,* 53 P.R.R. 238. Finally, this is not a criminal case but a *sui generis* disbarment proceeding, in which that rule does not apply. See *López De Tord & Zayas Pizarro* v. *Molina,* 38 P.R.R. 737, 749–50; *In re Ries,* 37 A. (2d) 417, 419 (N.J. 1944).

■■ Abella also contends that his action in accepting money for recording the Grillo document did not constitute the offense of bribery in violation of § 83 of the Penal Code on the ground that this offense would arise only if he acted contrary to law and here the document he recorded was valid and recordable. We do not stop to examine this as a possible defense in a criminal case. Cf. *Ex parte Montgomery, supra,* p. 317. We note only (1) that § 85 of the Penal Code makes it a misdemeanor for an executive or ministerial official to solicit or to receive a gratuity for doing any official act, cf. Act of March 10, 1904, found at p. 362, Penal Code, 1937

ed.; and (2) that even without reference to the Penal Code, such conduct by a member of our bar justifies disciplinary measures against him under our inherent power.

In view of the nature of the charges which have been proved by the testimony, an order will be entered disbarring Abella as an attorney-at-law.

Mr. Justice Marrero did not participate herein.